**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| RICCI and KAREN C.,<br>Parents and next of friends of L.C.,<br><br>Plaintiffs,<br><br>v.<br><br>BEECH GROVE CITY SCHOOLS and<br>SOUTHSIDE SPECIAL SERVICES OF<br>MARION COUNTY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 1:14-cv-00576-TWP-DML |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on cross-motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 by Plaintiffs Ricci and Karen C., parents and next of friends of L.C., (collectively, "Plaintiffs") (Filing No. 35), and by Defendants Beech Grove City Schools and Southside Special Services of Marion County (collectively, "Defendants" or "School") (Filing No. 42).  The dispute in this matter surrounds Plaintiffs' assertion that the hearing officer's decision was arbitrary and capricious and against the protections afforded by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*  Defendants developed an individualized education program for L.C. who has disabilities.  The Plaintiffs requested a due process hearing, asserting that the individualized education program was inappropriate.  Following a due process hearing, the hearing officer determined that the individualized education program was appropriate, and this lawsuit for judicial review followed.  Plaintiffs filed a Complaint requesting reversal of the hearing officer's decision regarding L.C.'s individualized education program to provide a free appropriate public education.  Both parties moved for summary judgment on the Complaint.  For

the following reasons, the Plaintiffs' Motion for Summary Judgment is **DENIED** and the School's Cross-Motion is **GRANTED**.

## I.     BACKGROUND

### A.     Individuals with Disabilities Education Act

The United States Congress enacted the Individuals with Disabilities Education Act ("IDEA") to "ensure that all children with disabilities have available to them a free appropriate public education," "prepare [children with disabilities] for further education, employment, and independent living," "ensure that the rights of children with disabilities and parents of such children are protected," and to "assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities." 20 U.S.C. § 1400(d)(1).

States are eligible to receive federal funding for the education of children with disabilities if the states meet certain criteria, including making a free appropriate public education available to all children with disabilities. *See* 20 U.S.C. § 1412. As part of the IDEA, school districts that receive federal education funds must provide children with disabilities a free appropriate public education in the least restrictive environment. *Bd. of Educ. v. Ross*, 486 F.3d 267, 273 (7th Cir. 2007). The IDEA provides as follows regarding education in the least restrictive environment:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). "[T]he IDEA requires that the school district educate [the disabled child] with his nondisabled peers to the 'greatest extent appropriate.'" *Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1066 (7th Cir. 2007) (citing 20 U.S.C. § 1412(a)(5)(A)).

"The IDEA requires that the state determine what is uniquely 'appropriate' for each child's education by preparing an [individualized education program] developed through the joint participation of the local education agency, the teacher, and the parents." *Hjortness*, 507 F.3d at 1064. An individualized education program ("IEP") is defined as "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title." 20 U.S.C. § 1401(14).

> In developing each child's IEP, the IEP Team . . . shall consider—
> (i) the strengths of the child;
> (ii) the concerns of the parents for enhancing the education of their child;
> (iii) the results of the initial evaluation or most recent evaluation of the child; and
> (iv) the academic, developmental, and functional needs of the child.

20 U.S.C. § 1414(d)(3)(A). Thus, "[t]he statute assures the parents an active and meaningful role in the development or modification of their child's IEP." *Hjortness*, 507 F.3d at 1064 (citing *Ross*, 486 F.3d at 274).

However, "parents, no matter how well-motivated, do not have a right under the [IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child." *Lachman v. Illinois State Bd. of Education*, 852 F.2d 290, 297 (7th Cir. 1988). "[J]ust because [a] placement was contrary to the parents' wishes, it does not follow that the parents did not have an active and meaningful role in the modification of their [child's] IEP." *Hjortness*, 507 F.3d at 1065–66. "School districts are not required to do more than to provide a program reasonably calculated to be of educational benefit to the child; they are not required to educate the child to his or her highest potential." *Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004). "A child's placement must be based on the IEP." *Hjortness*, 507 F.3d at 1064 (citing 34 C.F.R. § 300.116(b)(2)).

3

**B.**     **Factual and Procedural Background**

L.C. is a young man who qualifies for special education and related services.  He was born

June 7, 2004, and currently is a student at Fortune Academy, a private school that focusses on

educating students with language-based learning disabilities through multi-sensory instruction.

Plaintiffs Ricci and Karen C. are the parents of L.C.  Defendant Beech Grove City Schools is the

local school agency in which L.C. resides.  Defendant Southside Special Services of Marion

County is a special education cooperative with which Beech Grove City Schools contracts to

provide its students with special education and related services.

L.C.'s complex and diverse medical challenges began when he was in utero when he had

a stroke that led to an excessive accumulation of cerebrospinal fluid on the brain, a condition

known as hydrocephalus (Filing No. 1-2 at 7).  Because of this condition, within a few days of

L.C.'s birth, doctors were required to operate on L.C. to install a shunt to drain the fluid.  *Id.*  Since

this initial installation of the shunt, L.C. has had seven additional surgeries to either replace or

repair the shunt.  Whenever the shunt malfunctions, it leads to headaches, vomiting, and an unusual

gait.  L.C. also was diagnosed with cerebral palsy and mitochondrial disease when he was an

infant.  *Id.*

He also has right-sided spasticity and hemiparesis, which is weakness of the entire right

side of the body.  *Id.*  As a result of this condition, L.C. has little flexibility or strength in his right

hand and right leg.  In 2011, he had reconstructive surgery to his right foot to lengthen and relocate

tendons (Filing No. 1-2 at 8).  L.C. also had surgery to correct his strabismus, or lazy eye.  *Id.* at

7.

When L.C. was approximately two years old, he began experiencing seizures.  Health care

providers erroneously overdosed L.C. with seizure medication, which led to the development of

severe gastrointestinal issues manifest by reflux and choking when eating. *Id.* at 8. In 2009, when L.C. was approximately five years old, he underwent a radical procedure to eliminate his seizures. He underwent a left functional hemispherectomy, which is the removal of the entire left cerebral hemisphere of the brain. *Id.* While the hemispherectomy successfully eliminated L.C.'s seizures, the procedure left him blind in the right half of each eye. As a result, he has no peripheral vision to the right. L.C. has sensory sensitivities to light and to loud noises. His mitochondrial disease causes a loss of motor control, muscle weakness, and pain, and it significantly impedes his energy level.

In 2007, when L.C. was approximately three years old, the School evaluated L.C. to determine if he qualified for early childhood special education services. His development and skills were below average, so he qualified to receive early childhood special education services. L.C. participated in an early childhood services program at the School for one year (Filing No. 1-2 at 8). After this first year in the program, L.C.'s parents decided that they would homeschool him.

In May 2012, L.C.'s mother contacted the School to discuss the possibility of L.C. attending school there during the coming school year (A.R. 270)[1]. She informed School officials of L.C.'s extensive medical challenges and noted some of her concerns with L.C.'s participation in public school. She informed the School that L.C. would need a one-on-one assistant to help him throughout the school day. She also provided the School with physical therapy and occupational therapy evaluations. *Id.* The School conducted a multidisciplinary evaluation of L.C. during the summer of 2012 to assist in determining L.C.'s educational needs (A.R. 271–72).

---

[1] The parties manually filed under seal the administrative record of the proceedings that are under review in this case (Filing No. 23). The Court will use the abbreviation "A.R." for all citations to the manually-filed administrative record.

The evaluation was deficient considering L.C.'s extensive medical history and challenges.  The School held a case conference committee meeting in August 2012 to review L.C.'s evaluations and determine an appropriate IEP for L.C. for the coming school year.  L.C.'s mother expressed specific concerns with the School's IEP (A.R. 273–74).

L.C. attended the School for two half-days on August 27 and 28, 2012, but it quickly became clear that the School was not prepared for L.C.'s special needs.  The principal refused to allow L.C.'s mother to observe L.C.'s classroom and provide direction to the teachers and staff (A.R. 276–77).  The Plaintiffs met with the School on September 11, 2012, and suggested placing L.C. at Fortune Academy.  The School opposed the placement and ended the meeting (A.R. 279).  Because the Plaintiffs did not believe the School offered a free appropriate public education to L.C. as required by the IDEA, they unilaterally withdrew L.C. from the School and enrolled him at Fortune Academy.  He started at Fortune Academy in October 2012 (A.R. 280).

On October 30, 2012, the Plaintiffs filed a request for a due process hearing to challenge the School's 2012 IEP for L.C. (A.R. 263).  A due process hearing was held over four days in January 2013, and in February 2013, the hearing officer issued a decision in favor of the Plaintiffs (A.R. 262).  The hearing officer determined that the School's IEP was not reasonably calculated to confer an educational benefit on L.C., and therefore, did not provide a free appropriate public education to L.C.  The hearing officer ordered that the School pay for L.C.'s education at Fortune Academy for the 2012–2013 school year.  The School also was ordered to collect additional data and devise an appropriate IEP for L.C. (A.R. 291–92).  The hearing officer ordered that "[i]f, after reviewing data from Fortune Academy and other sources, the Case Conference Committee determines the School could devise an appropriate IEP that would enable the School to provide a

free appropriate public education, the School shall involve Fortune Academy staff and the Student's mother to facilitate transition to a new educational environment." (A.R. 292.)

In May 2013, Fortune Academy provided to the School an assessment report of two curriculum-based tests, two reports of an achievement test, and seventeen pages of written work from L.C. (Filing No. 1-2 at 10–11). These tests indicated that L.C. had made improvements in various areas while he attended Fortune Academy. During June and July 2013, the School conducted a multidisciplinary educational evaluation of L.C. *Id.* at 11. The School attempted to conduct classroom observations of L.C. at Fortune Academy as part of the evaluation, but because of an impasse over Fortune Academy's policies for observations, the observations never occurred. *Id.* at 13. The School's evaluation confirmed that L.C. had verbal, visual, motor, intellectual, and academic deficiencies; however, he had strong social skills. The evaluation also revealed that L.C. had a significant need for assistive technology. *Id.* at 11–13.

On July 26, 2013, the School met with L.C.'s parents to discuss the 2012 IEP and the upcoming 2013 IEP. L.C.'s mother noted that the School did not have certain plans in place and mentioned L.C.'s progress reports from Fortune Academy, to which the School responded that the progress reports had never been provided (A.R. 2114). Later on July 26, 2013, the School asked Fortune Academy to provide to the School L.C.'s health care action plan, his evacuation plan, and his progress reports from his classroom teacher in preparation for the case conference committee meeting in August to assist the School in developing the 2013 IEP for L.C. (A.R. 1186). Fortune Academy staff were on summer break at the time of the request and did not provide the requested documents when they returned (Filing No. 1-2 at 14). Fortune Academy created quarterly progress reports for L.C. during the 2012–2013 school year, and L.C.'s parents received these reports on January 18, 2013, March 28, 2013, and at the end of the fourth quarter of school via mail, yet they

did not provide the progress reports to the School at the July 26, 2013 meeting or after the meeting. The Plaintiffs and Fortune Academy did not provide the progress reports to the School despite knowing of the School's need for the reports to help create an appropriate IEP (A.R. 872, 1242–50; Filing No. 1-2 at 14).

Based on the information available to it, the School developed a 2013 IEP for L.C. and held a case conference committee meeting on August 9, 2013. The draft 2013 IEP placed L.C. in his local public school, South Grove Intermediate School (A.R. 1112). The case conference committee meeting was held to discuss the draft IEP with the intent to finalize an IEP for 2013–2014. At the beginning of the meeting, L.C.'s parents requested an independent educational evaluation of L.C. The School denied the parents' request and filed a request for a due process hearing to determine the adequacy of the School's 2013 evaluation (Filing No. 1-2 at 15).

The same hearing officer who had presided over L.C.'s due process hearing in January 2013 and had issued a decision favorable to L.C. in February 2013 presided over the School's requested due process hearing. After receiving testimony and evidence, the hearing officer determined that the School had conducted an appropriate educational evaluation, thereby abrogating any obligation to pay for L.C.'s requested independent educational evaluation (Filing No. 34-2 at 17–18).

During the August 2013 case conference committee meeting, L.C.'s parents and teacher and staff from Fortune Academy provided input to the School regarding reports, evaluations, and the draft IEP (Filing No. 1-2 at 16–17). They provided input about L.C.'s progress at Fortune Academy and addressed some of the proposed goals in the IEP. However, they did not provide new documents, evaluations, or reports. Another meeting was held on September 30, 2013, which involved L.C.'s parents and the School, during which the parents provided additional feedback

about the IEP (Filing No. 1-2 at 17; A.R. 1145).  Based on the input received from L.C.'s parents

and Fortune Academy's teacher and staff, the School made some revisions to the draft 2013 IEP

and finalized the proposed IEP on October 7, 2013 (A.R. 1112).

At the time that the 2013 IEP was finalized, L.C. was nine years old and starting the fourth

grade (A.R. 1112).  The IEP noted that L.C. was eligible for special education services based on a

primary disability of traumatic brain injury with secondary disabilities of orthopedic impairment,

other health impairment, and blind or low vision (A.R. 1123).  The IEP established goals in various

areas for L.C. for the 2013–2014 academic year as well as methods for measuring L.C.'s progress

toward achieving those goals.  The IEP also noted the diverse and numerous limitations and

challenges that L.C. experiences, and it established numerous accommodations, modifications,

strategies, and services to address L.C.'s limitations and challenges.  The IEP proposed placement

of L.C. at South Grove Intermediate School and established a support plan to help L.C. transition

from Fortune Academy to South Grove Intermediate School (A.R. 1136).

The IEP provided for L.C. to receive some general education with his non-disabled peers,

some special education, a one-on-one aide to assist throughout the day, rest periods, and assistive

technology.  The IEP also provided for training for teachers and staff at the School as well as peer

awareness training (A.R. 1112–45).  It also included statements from L.C.'s parents regarding his

strengths, interests, and activities, as well as their concerns; a summary of L.C.'s medical history;

progress monitoring data; and L.C.'s then-present levels of achievement and skills.  *Id.*

The School provided the final proposed 2013 IEP to L.C.'s parents, and after their review,

the parents filed a request for a due process hearing to challenge the appropriateness of the IEP

(Filing No. 1-2 at 2).  The same hearing officer assigned to the two previous due process hearings

involving the School and L.C.'s parents was assigned to conduct this due process hearing. The due process hearing was held on February 4, 5, 17, and 24, 2014. *Id.* at 1.

Before the due process hearing was held, L.C.'s parents hired Dr. Shauna Erenberg ("Dr. Erenberg") to conduct an independent educational evaluation and to provide testimony at the due process hearing. Dr. Erenberg reviewed the earlier evaluation reports, L.C.'s academic progress reports, his school work samples, the assessment reports, and the School's proposed IEP. Dr. Erenberg interviewed the School's teachers and staff. She also conducted classroom observations of the proposed placement, classroom observations of L.C. at Fortune Academy, and an additional academic achievement assessment (Filing No. 1-2 at 27). Dr. Erenberg had many criticisms of the School's 2013 multidisciplinary evaluation report and the 2013 IEP. Dr. Erenberg's evaluation was conducted in January 2014, so it was not available to the School for consideration and incorporation into the IEP when the October 2013 IEP was finalized. *Id.* at 28.

After holding the due process hearing on February 4, 5, 17, and 24, 2014, the hearing officer issued her decision on March 11, 2014 (Filing No. 1-2). In the decision, the hearing officer addressed each of the complaints that the Plaintiffs had regarding the School's 2013 IEP. The hearing officer reviewed and discussed the 2013 IEP. She addressed L.C.'s medical challenges, the evaluations, the procedural history of the parties' interactions and legal matters, and the hearing officer's previous decisions. The hearing officer ruled in the School's favor and determined that the School's 2013 IEP met the legal requirements of 511 I.A.C. 7, was reasonably calculated to confer an educational benefit on L.C., and provided an appropriate placement in the least restrictive environment for L.C. The hearing officer also directed the School to update the IEP to reflect new levels of performance, goals, and implementation dates because of the passage of time between

the IEP date and the decision date.  *Id.* at 29.  The Plaintiffs filed their request for judicial review

of the hearing officer's decision on April 14, 2014.

## II.    STANDARD OF REVIEW IN IDEA CASES

In the context of judicial review of IDEA cases, "the standard of review differs from that

governing the typical review of summary judgment."  *Evanston*, 356 F.3d at 802 (citation and

quotation marks omitted).  When reviewing the decision below, "the court—(i) shall receive the

records of the administrative proceedings; (ii) shall hear additional evidence at the request of a

party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as

the court determines is appropriate."  20 U.S.C. § 1415 (i)(2)(C).  "So the court can take new

evidence in addition to receiving and reviewing the administrative record.  But when no new

evidence is offered--as here--the cases are decided on summary judgment, which is the procedural

vehicle for asking the judge to decide the case on the basis of the administrative record."  *Evanston*,

356 F.3d at 802.

The Seventh Circuit has explained that "[e]ven though it is grounded on an administrative

record, the decision must be based on a preponderance of the evidence, and the person challenging

the decision of the agency bears the burden of proof."  *Id.*  Further, "[t]he district court must give

'due weight' to the results of the administrative proceedings and must not substitute its 'notions of

sound educational policy' for those of the school district."  *Id.* (citations omitted).  This is because

"courts lack the specialized knowledge to resolve issues of educational policy. . . .  School districts

are not required to do more than to provide a program reasonably calculated to be of educational

benefit to the child; they are not required to educate the child to his or her highest potential."  *Id.*

(citations omitted).

11

## III.    DISCUSSION

### A.    Scope of Judicial Review

The Court first addresses the scope of its judicial review of the hearing officer's decision challenged by the Plaintiffs in their Complaint.  The Plaintiffs assert that they are seeking relief from this Court based on the hearing officer's March 11, 2014 decision as well as "for the Defendants' failure to implement the IHO's prior decision, HR-017-2013, which aggrieves Plaintiff's rights."  (Filing No. 1 at 1.)

When a party challenges a hearing officer's decision in an IDEA case, "[t]he party bringing the action shall have 90 days from the date of the decision of the hearing officer to bring such an action, or, if the State has an explicit time limitation for bringing such action under this subchapter, in such time as the State law allows."  20 U.S.C. § 1415 (i)(2)(B).  Indiana's administrative code that governs special education claims establishes that "[u]nder IC 4-21.5-5-5, a petition for review by a state or federal civil court must be filed within thirty (30) calendar days after the date the independent hearing officer's written decision is received by the party."  511 I.A.C. 7-45-9.  Based on the time limitation set for bringing a civil action to challenge a hearing officer's decision and the Plaintiffs' case being filed on April 14, 2014, the only decision that can be challenged by the Plaintiffs is the March 11, 2014 decision, wherein the hearing officer determined that the School's 2013 IEP for L.C. was reasonably calculated to confer an educational benefit and therefore provided a free appropriate public education.  The substance and content of the hearing officer's earlier decisions—dated February 28, 2013 and November 12, 2013—will not be reviewed because those decisions fall outside the limitations period.

The Plaintiffs further allege that they have been "aggrieved" by the School's "failure to implement" the hearing officer's February 28, 2013 decision.  They assert that the hearing officer

"refused to consider whether L.C. had been denied a free appropriate public education by the School's failure to follow the first decision." (Filing No. 1 at 4, ¶25.)  The Plaintiffs further allege that the hearing officer "wrongly dismissed the issue of whether L.C. was denied a free appropriate public education by the School's failure to implement her original hearing decision." (Filing No. 1 at 5, ¶29.)

The School asserted in its summary judgment Response Brief that the Plaintiffs failed to raise the issue of implementation of the 2012 IEP in their opening brief, and therefore, the argument is waived for judicial review on the summary judgment motions.  In their Response-Reply Brief, the Plaintiffs only briefly mention in a footnote the issue alleged in their Complaint. They note that they "tried to ask the hearing officer to look at whether L.C. was denied a free appropriate public education because the School had not fully implemented her orders from 2013, but the hearing officer refused to consider whether this denied L.C. a free appropriate public education.  This too was error." (Filing No. 46 at 34.)

The Seventh Circuit has been clear that issues must be raised in opening briefs and must be developed through argument supported by legal authority.  *See Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 758 (7th Cir. 2012) ("because appellants did not raise this issue in their opening briefs, they waived any argument on this ruling"); *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (argument addressed in two sentences in opening brief deemed waived); *Boomer v. AT&T Corp.*, 309 F.3d 404, 422 n.10 (7th Cir. 2002) (where party fails to support position with any legal analysis or citation, the argument is waived); *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived").

Without any legal analysis or supporting authority, the Plaintiffs briefly mention in a footnote in their Response-Reply Brief their claim that the hearing officer erred by not considering the School's alleged failure to implement the 2012 IEP. Because the Plaintiffs did not address this claim in their opening brief and did not develop it with supporting legal authority, the Court determines that the claim relating to the failure to implement the 2012 IEP is waived. Thus, the scope of judicial review in this matter is limited to a review of the hearing officer's March 11, 2014 decision regarding the 2013 IEP for L.C.

**B.**      **Review of the Hearing Officer's March 11, 2014 Decision**

When reviewing a hearing officer's IDEA decision, the district court's inquiry is twofold.

First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07 (1982). Thus, a reviewing court looks at whether the school agency complied with the procedures of the IDEA and whether the IEP is reasonably calculated to enable the student to receive educational benefits. As noted above, the district court gives "due weight" to the hearing officer's decision and will not substitute its own notions of sound educational policy for those of the school district because courts lack the specialized knowledge to resolve issues of educational policy. *Evanston*, 356 F.3d at 802.

The Plaintiffs did not challenge the hearing officer's decision based on any procedural deficiencies that fell short of the protections granted by the IDEA. Rather, the Plaintiffs focus their Complaint and summary judgment argument on the substance of the 2013 IEP and the hearing officer's determination that the IEP is reasonably calculated to provide educational benefits to L.C. Therefore, the Court will not address at length the first *Rowley* inquiry—procedural compliance

14

with the IDEA—but rather focus on the second inquiry regarding the substance of the IEP and the hearing officer's decision.

Regarding procedural compliance with the IDEA, the Court briefly notes that the Plaintiffs met with the School on multiple occasions to discuss L.C.'s education and special needs and participated in developing IEPs for L.C.  When they were dissatisfied with the case conference committee's final IEPs, the Plaintiffs requested and received due process hearings.  The hearing officer allowed the parties to conduct discovery, received evidence, held hearings over multiple days, and listened to testimony and argument during the hearings.  The hearing officer timely issued written decisions following the hearings.  After her review, the hearing officer concluded that the "October 7, 2013 proposed IEP met the requirements of 511 IAC 7," (Filing No. 1-2 at 29), which is the administrative code enacted by the State of Indiana to implement the requirements of the IDEA.  Upon review of the record, the Court agrees with the hearing officer's conclusion and determines that the School complied with the procedures set forth in the IDEA thereby satisfying the first inquiry set forth in *Rowley*.

Turning to the substance of the 2013 IEP and the hearing officer's determination that it was appropriate, on judicial review, the Plaintiffs reassert the same fifteen arguments that they made to the hearing officer when they initially challenged the School's proposed IEP.  The Plaintiffs argue that the proposed IEP is not reasonably calculated to provide an educational benefit to L.C. because: (1) it was hypothetical; (2) L.C. was making progress at Fortune Academy and transfer from there would be detrimental; (3) the one-on-one aide had not yet been hired; (4) public school placement would be detrimental to L.C.'s safety, independence, and ability to learn; (5) the writing goal was actually an assistive technology goal; (6) use of projection screens and amplification devices conflicted with L.C.'s sensory sensitivities and needs; (7) the reading goal focused on

15

fluency rather than accuracy; (8) L.C. already had achieved the skills identified in the math goal; (9) L.C. already performed the skills identified in the self-advocacy goal; (10) the numerous accommodations and modifications make South Grove Intermediate School more restrictive and L.C. less independent; (11) the IEP did not include a health care action plan; (12) the IEP did not include any social goals; (13) the IEP did not include any science or social studies goals; (14) the IEP did not include any physical therapy or occupational therapy goals; and (15) the IEP did not include goals that the hearing officer stated in her first due process decision should have been included in the 2012 IEP.

Pervading throughout their fifteen arguments is the Plaintiffs' incorrect assertion that the Title VII burden shifting analysis applies to this IDEA case. The Plaintiffs point to a Tenth Circuit opinion in a Title VII case and then explain the well-known burden shifting analysis that applies in Title VII employment discrimination cases. Then, throughout their arguments, the Plaintiffs assert that they met their "burden of production," and the School failed to respond by meeting its burden. However, this is not the standard in IDEA cases. "[T]he decision must be based on a preponderance of the evidence, and the person challenging the decision of the agency bears the burden of proof." *Evanston*, 356 F.3d at 802.

Also pervading throughout much of their fifteen arguments is the Plaintiffs' praise of Fortune Academy's educational program and a comparison between Fortune Academy and the proposed IEP. The Plaintiffs' arguments focus on their desire for L.C.'s placement at Fortune Academy and compare the benefits of an education at Fortune Academy to those offered at the School's public placement. But the Court's review does not entail a comparison test, and the School does not have to provide the "best" education available, *Id.,* ("[s]chool districts are not

required to do more than to provide a program reasonably calculated to be of educational benefit

to the child; they are not required to educate the child to his or her highest potential").

As the School noted in its Response Brief:

Plaintiffs, then, must do more than merely show that the placement they
prefer would be better for the Student.   *J.P. v. West Clark Community Schools*, is
instructive on this point:

In making their arguments, the [parents] understandably have
glossed over the distinction between what is "appropriate" for J.P.
and what is "best."   The IDEA empowers parents to be strong
advocates for their children.   It is the [parents'] right and duty to
attempt to push and cajole West Clark into providing the best
possible education for J.P.   To that end, the [parents] have argued
strongly that J.P. began progressing much more rapidly once he
started his ABA/DTT training.   But, while such an argument is
highly relevant at a case conference meeting, it does not carry much
weight in this legal action.   The law does not require West Clark to
provide J.P. with the better or best possible education.   West Clark's
duty is only to provide an education that is reasonably calculated to
benefit J.P.   Therefore . . . the [parents] will have to do more than
merely show that the IEP they have proposed would be better for
J.P.; they must show that the IEP proposed by West Clark was
"inadequate," in the strict legal sense prescribed by the IDEA.

230 F. Supp. 2d 910, 934 (S.D. Ind. 2002).

([Filing No. 43 at 25](#).)   The hearing officer noted in the conclusion of her decision that,

The fundamental inquiry in this current case, though, is not whether the private
placement continued to be appropriate for the Student.   Rather, the guiding question
lies in whether the School devised an individualized educational plan that addressed
the Student's unique array of needs and was reasonably calculated to confer an
educational benefit in the least restrictive environment.

([Filing No. 1-2 at 42](#).)   The hearing officer concluded, "The School created such a plan for this

Student."   *Id.*

Upon review of the substance of the School's proposed 2013 IEP, the record evidence, the

hearing officer's decision, and the Plaintiffs' fifteen arguments made again to this Court, the Court

concludes that the Plaintiffs are in essence asking this Court to substitute its own notions of sound

educational policy for those of the school district's, which, this the Court cannot do.  *See Evanston*, 356 F.3d at 802.  The hearing officer's findings of fact and conclusions of law were supported by the documentary evidence and the testimony presented to her during the due process hearing. Nothing in the record indicates that the Court should deviate from giving due weight to the hearing officer's decision regarding the 2013 IEP being reasonably calculated to provide an educational benefit to L.C. in the least restrictive environment.

Relying on non-binding case law from the Third Circuit, the Plaintiffs further argue that the hearing officer erred because she did not compare the differences between Fortune Academy and the public school placement to determine any detriment to L.C. if he was required to be placed in public school.  However, binding Seventh Circuit case law does not require a comparison between potential school placements in order to speculate whether detriment will result from removing a student from private school and placing him in public school.  Rather, Seventh Circuit cases such as *Evanston*, *Ross*, and *Hjortness*, direct that the hearing officer and reviewing courts consider whether the proposed IEP will confer an educational benefit, not the best education available, when determining the appropriateness of an IEP.  There was no error committed by the hearing officer based on this argument from the Plaintiffs.

The Plaintiffs also argue that the hearing officer erred because she determined that South Grove Intermediate School was the least restrictive environment for L.C. based on a misapplication of the law that required "under any set of circumstances" and "without qualification" that L.C. be placed in a public school setting (Filing No. 37-1 at 47).  However, this is not how the hearing officer came to the conclusion that South Grove Intermediate School was the least restrictive environment for L.C.  The hearing officer did not analyze this issue under a "public placement under any set of circumstances" rubric.  Rather, she acknowledged the presumption of general

education with non-disabled peers as required by Section 1412(a)(5)(A) of the IDEA and discussed in *Hjortness*, 507 F.3d at 1066.  Then the hearing officer discussed the record evidence and the School's decision based on that evidence that it could provide a free appropriate public education to L.C. while meeting his unique needs.  The hearing officer then discussed the Plaintiffs' failure to provide evidence to challenge the adequacy of the School's IEP.  The hearing officer determined that the School's placement was appropriate, and thus, there was no need based on the evidence in this case to consider outside placement contrary to the IDEA's presumption of general education with non-disabled peers (Filing No. 1-2 at 40–41).  The hearing officer did not err in this regard.

Finally, the Plaintiffs summarize portions of L.C.'s proposed schedule at the public school to argue that L.C. will gain no meaningful educational benefit from being placed at South Grove Intermediate School.  The Plaintiffs' argument does not comprehensively discuss L.C.'s proposed schedule, and the argument ignores many of the accommodations and modifications that were proposed to address L.C.'s needs.  The Plaintiffs reassert many of the complaints that they initially raised about the School's plans, while ignoring benefits that the hearing officer recognized would be provided by the IEP.  That the Plaintiffs ignore the benefits provided by the IEP as recognized by the hearing officer does not mean that there are no benefits afforded to L.C. through the proposed IEP.  This argument from the Plaintiffs is unavailing.

Giving due weight to the decision of the hearing officer and finding no error therein, the Court holds that the hearing officer's March 11, 2014 decision was supported by the evidence and correctly decided.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court **DENIES** the Plaintiffs' Motion for Summary Judgment (Filing No. 35) and **GRANTS** the School's Cross-Motion for Summary Judgment

(Filing No. 42).   The School's proposed 2013 IEP was reasonably calculated to provide educational benefits to L.C. thereby providing a free appropriate public education to him.   The procedural protections afforded by the IDEA were provided to the Plaintiffs.

In her written decision, the hearing officer concluded, "given that approximately five months have passed since the October 7, 2013 IEP, the Student's Case Conference Committee needs to update implementation dates and review goals to ensure they are consistent with additional information the School has received since October 2013 and the Student's current performance levels."   (Filing No. 1-2 at 29.)   Because of the additional passage of time, this specific mandate from the hearing officer's 2014 decision is even more important today.   The parties are **ORDERED** to convene a case conference committee within **fourteen (14) days** from the date of this Order to provide an updated IEP for L.C., so as to determine the current appropriate placement.

Regarding responsibility for payment of L.C.'s tuition at Fortune Academy during the pendency of the administrative proceedings below, the hearing officer ordered:

> The School shall be responsible for paying Student's tuition at the private placement until the date the Student is transitioned to South Grove Intermediate School pursuant to the Student's updated IEP.  If the Student's parents opt to have the Student remain at the private placement at their expense, the School shall be responsible for paying the Student's tuition through the date of receipt of this Decision.

(Filing No. 1-2 at 44).   The "stay-put" provision of the IDEA states that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j).

Consistent with the hearing officer's order, the "stay-put" provision of the IDEA, and the Court's Entry on Emergency Motion for Preliminary Injunction (Filing No. 18) ordering that L.C.

20

was to remain at Fortune Academy during the pendency of this matter, unless the State or local educational agency and the parents otherwise agree,  the School is **ORDERED** to pay the tuition for L.C.'s education at Fortune Academy until the date of this Order. Final judgment will issue under separate order.

**SO ORDERED.**

Date: 8/1/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Alexandra Marie Curlin
CURLIN & CLAY LAW
amcurlin@curlinclaylaw.com

Robin C. Clay
CURLIN & CLAY LAW
rclay@curlinclaylaw.com

Alexander Phillip Pinegar
CHURCH CHURCH HITTLE & ANTRIM
apinegar@cchalaw.com

Amy Ann Matthews
CHURCH CHURCH HITTLE & ANTRIM
amatthews@cchalaw.com